## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **MARY CONDOR,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiff,** | |
| **v.** | |
| | **Case No. 2:07cv924** |
| **WEST BOUNTIFUL CITY,** | |
| **Defendant.** | **Magistrate Judge Paul M. Warner** |

Before the court is West Bountiful City's (the "City") motion for summary judgment.[1]  A hearing on the motion was held on April 16, 2009.  At the hearing, the City was represented by Maralyn M. Reger, and Mary Conder[2] was represented by Russell T. Monahan.  Before the hearing, the court carefully considered the motion, memoranda, and other materials submitted by the parties.  After considering the arguments of counsel and taking the motion under advisement, the court renders the following memorandum decision and order.

### BACKGROUND

In the summer of 2005, the West Bountiful City Police Department (the "WBCPD") sought applications for an open police officer position.  Ms. Conder applied for that position, as did a man by the name of Roger Green.  Mike Wright ("Chief Wright") was the WBCPD police

---

[1] *See* docket no. 26.

[2] The plaintiff is identified in the complaint as Mary Condor but the correct spelling of her last name is Conder.  The court will refer to Mary Condor as "Ms. Conder."

chief at the time.  At the direction of Chief Wright, Sergeant James Sheldon ("Sergeant Sheldon") conducted a background check of both applicants.  Sergeant Sheldon reported to Chief Wright that Ms. Conder had a favorable background and that several of her former employers provided good references for her.  In August 2005, Chief Wright offered the position to Ms. Conder.  Ms. Conder accepted the offer and began her employment with the WBCPD in September.  As is customary with new employees, Ms. Conder was placed on probation for a period of one year.

Soon after Ms. Conder was hired, Chief Wright was contacted by one of Ms. Conder's prior employers, Cory Green.  Cory Green is the son of the other applicant for the police officer position, Roger Green.  Cory Green made several allegations of misconduct against Ms. Conder. Chief Wright discussed the matter with the mayor and city administrator and concluded that Cory Green "was merely crying sour grapes over the non-selection of his father, Roger Green," for the police officer position.[3]

In January 2006, James Behunin ("Mayor Behunin") was sworn in as the City's new mayor.  Prior to being sworn in as mayor, Mayor Behunin was a member of the City Council. During his tenure on the City Council and as the newly elected mayor, Mayor Behunin had observed the WBCPD, had received citizen and officer comments, and had come to the conclusion that the WBCPD needed a greater level of professionalism and discipline.  Mayor Behunin testified as follows:

---

[3] Docket no. 28, exhibit 6.

> I was careful to observe the conduct of the police department through December and January, and reached the conclusion, um, many weeks into my term of office, that the police department was not disciplined. And that, um, we needed a level of discipline that was greater than what we had observed -- and what I had observed, first as a council member, and then what had been certainly demonstrated to me through these records. But it wasn't just the record, it was also discussions with the police officers themselves, and many former police officers who had moved onto neighboring communities and had indicated to me that they felt like the department was, um -- was not conducting itself in the professional level that the citizens expected.[4]

Mayor Behunin testified that he was also aware of specific allegations of misconduct against Chief Wright and Sergeant Sheldon.

Within the first few months of Mayor Behunin's term, he was also contacted by Cory Green.  Like he did with Chief Wright, Cory Green informed Mayor Behunin that he considered Ms. Conder unsuitable to the position of police officer because he claimed that during her employment as a security officer for his company, she engaged in dishonest conduct.

Mayor Behunin testified in his deposition that, although he could not remember specifics, either he or the City Council requested that the allegations against Chief Wright, Sergeant Sheldon, and Ms. Conder be investigated by West Valley City's Internal Affairs Department (the "IA Investigation").  During the portion of the IA Investigation related to Ms. Conder, interviews were conducted of various people, including Cory Green; James Evans ("Mr. Evans"), Ms. Conder's supervisor when she was employed as a security officer at the Grand America Hotel; and Ms. Conder.

---

[4] Docket no. 27, exhibit 34 at 17:10-23.

When interviewed by the IA investigator, Cory Green made several allegations against Ms. Conder.  For instance, he informed the IA investigator that Ms. Conder had called into work claiming to be sick when she was not.  Cory Green also alleged that Ms. Conder had been overpaid by her former employer, Thompson & Mitchie Security, and that she closed her bank account and walked off that job.[5]

Mr. Evans told the IA investigator during his interview that he expressed grave reservations about Ms. Conder's suitability as a police officer.  In particular, Mr. Evans described an incident where he reprimanded Ms. Conder for failing to properly handle a lost credit card that was turned in to Ms. Conder by the hotel staff.[6]

When interviewed by the IA investigator, Ms. Conder stated she remembered Cory Green talking to her about misuse of sick time and the conversation "didn't go well."[7]  Ms. Conder admitted that during her employment at the Grand America Hotel, there was an allegation that she had mishandled a credit card that was turned in to her.  She stated that she was verbally

---

[5] Cory Green made several other allegations against Ms. Conder.  For example, he alleged that Ms. Conder had stolen gas using the company gas credit card by putting gas in her personal vehicle, that she attempted suicide, and that she had sex in the back of a patrol vehicle with another employee.  Ms. Conder vehemently denies these allegations.  The court will discuss only those allegations to which Ms. Conder somewhat concedes.

[6] Like Cory Green, Mr. Evans made other allegations against Ms. Conder, which she adamantly denies.  For example, Mr. Evans alleged that Ms. Conder used her authority to make several "all access" pass cards to the hotel with different variations of her name and that this was a serious breach of security and against hotel policy.  Ms. Conder claims that she made the additional security key cards because the maintenance department repeatedly disabled her current card and that making the additional cards was not in violation of hotel policy.  Again, the court will address only those allegations for which Ms. Conder partially concedes.

[7] Docket no. 27, exhibit 4 at p. 7; *see also id.*, exhibit 35 at 89:4-21.

reprimanded for it and that she recalled some type of written documentation accompanying the verbal reprimand.  However, Ms. Conder denies that she mishandled the credit card.  Ms. Conder also informed the IA investigator that she was overpaid by Thompson & Mitchie Security and that she quit before the company could recover the money.  Ms. Conder admitted that she was ordered by a court to pay back the money and that the company had to garnish her paychecks from the Grand America Hotel in order to recover the money.  When asked by the IA investigator why she did not indicate these employment problems on her personal history statement, Ms. Conder explained that it was not her intention to mislead the City but now realizes that she should have disclosed them on her application.

As part of the application process, Ms. Conder filled out an application for employment and a personal history statement.  The personal history statement provides that "[a]ny attempt to misrepresent, omit or falsify information will result in the immediate denial of further consideration for employment or will be cause for immediate dismissal if an appointment has been made."[8]

In her personal history statement, Ms. Conder indicated that she has never had a supervisor reprimand her "for misconduct or not doing [her] job right" nor has she "had any arguments concerning job duties or working conditions with any supervisor or co-worker."[9] When asked about the answers to these questions during her deposition, Ms. Conder stated that until her employment with the WBCPD she had never been verbally reprimanded or "written up"

---

[8] *Id.*, exhibit 2.

[9] *Id.* at question 23(b) & (c).

for misconduct or for failing to do her job correctly.[10]  Also in her personal history statement, Ms. Conder answered affirmatively to inquiries about whether she has (1) ever "defaulted on any loan, debt or obligation in the past five years" and (2) "had [her] wages attached or garnished."[11] To explain these answers, Ms. Conder wrote that she has had "some old medical bills[,] debits, and charge cards.  That [sic] [she has] consulted with an attorney at Lincoln Law . . . [and that] some of them are debits from [her identification being] stolen as well."[12]  But when asked about these two questions during her deposition, Plaintiff did not mention medical bills or charge cards; rather, she explained that she owed money to Thompson & Mitchie Security and to Check City.  Specifically, she asserted that she took out a loan from Check City and never paid it back. She also stated that she owed Thompson & Mitchie Security because "[t]hey deposited money into my checking account that I thought was mine and I spent it on bills and then they told me it wasn't my money."[13]

In February 2006, the City terminated the employment of Chief Wright.  In an affidavit, Chief Wright stated that he found Ms. Conder "to be an accomplished police officer who performed her duties in a competent manner."[14]  In May 2006, Randy Lloyd ("Chief Lloyd") was

---

[10] *Id.*, exhibit 35 at 45: 17-21.

[11] *Id.*, exhibit 2, question 33(a) & (b).

[12] *Id.*

[13] *Id.*, exhibit 35 at 53:13-15.

[14] Docket no. 28, exhibit 6.

hired to replace Chief Wright.  Shortly after he was hired, Mayor Behunin informed Chief Lloyd

that the City needed a more disciplined and professional police department.

After the IA Investigation was completed, the West Valley City's IA investigators issued

a report to the City (the "IA Report").  Chief Lloyd testified in his deposition that after he had

accepted the position of Chief of Police, he went to a meeting with Mayor Behunin, the City

Manager, and two attorneys to discuss the IA Report and the concerns the City had with

Sergeant Sheldon and Ms. Conder.  Chief Lloyd testified that the gist of the discussion was,

"Would I want to retain Mary Conder or to let her go?  And . . . how we wanted to deal with

James Sheldon.  Should he be retained?  Let go?  Reprimanded?  Et cetera."[15]

Ms. Conder was given a copy of the portions of the IA Report that related to the

investigation of allegations of misconduct against her, along with a letter dated May 2, 2006,

from Mayor Behunin.  The letter stated that based on the IA Report, the City had decided to

retain Ms. Conder but extend her probation for an additional year.  Mayor Behunin also stated

that the City wanted to have "a more effective police department that has the full support of its

members, other City personnel, and the community generally.  We expect you to be part of that

process by abiding by all personnel policies and procedures, and setting a positive example for

other officers to follow."[16]  In his deposition, Mayor Behunin testified that the reason the City

and Chief Lloyd decided to extend Ms. Conder's probation rather than terminate her

---

[15] Docket no. 27, exhibit 39 at 29:13-24.

[16] *Id.*, exhibit 6.

employment was to "give her a chance to rise to a new standard."[17]  Mayor Behunin also stated

that the City wanted "to give her a chance to . . . learn what it took to become an officer" and to

give "her enough time to . . . meet our expectations."[18]

Shortly after Chief Lloyd was hired, he restructured the department and demoted

Sergeant Sheldon to the position of corporal.  Sergeant Sheldon resigned shortly after his

demotion.  In an affidavit, Sergeant Sheldon stated that he "found Ms. Conder to be an

accomplished police officer who performed her duties in a competent manner" and that she "was

as good as the male officers employed by" the WBCPD.[19]

On June 30, 2006, Ms. Conder received a performance evaluation.  While most of her

ratings were either "satisfactory" or "good," she also received the rating "marginal" for her

verbal expression and human relations.[20]  In August 2006, Ms. Conder received a training

memorandum from her supervisor, Corporal Michael Buchanan ("Corporal Buchanan"),

counseling her regarding her conduct during a DUI investigation.  The memorandum states that

at the suspect's request, Ms. Conder went to his house to obtain his wheelchair.  Ms. Conder

went to the suspect's home alone, found the home unoccupied, entered the home, and took a

wheelchair.  She failed to complete a report on the incident.  Ms. Conder was instructed to (1)

never enter a private residence alone especially when going to retrieve personal property, (2)

---

[17] Docket no. 28, exhibit 2 at 54:4-9

[18] Docket no. 27, exhibit 34 at 56:9-12.

[19] Docket no. 28, exhibit 5.

[20] Docket no. 27, exhibit 8.

always complete an initial report when removing property from a private residence, and (3) always complete an initial report when backing another officer on an investigation resulting in an arrest.

On August 27, 2006, Ms. Conder and other officers had their police reports returned to them for corrections.  In her deposition, Ms. Conder stated that she was aware that other officers' reports had been returned to them for corrections.  In October 2006, Ms. Conder wrote a police report of telephone threats, and Corporal Buchanan informed her that she needed to add information to her report.  Ms. Conder had to relisten to telephone tapes in order to correct her report.

In November 2006, Ms. Conder received a written memorandum from Corporal Buchanan stating that the narrative of a report Ms. Conder filed did not justify the arrest she made because she did not include information to support the elements of the crimes.  Corporal Buchanan also indicated that Ms. Conder failed to have a witness sign as a complainant before she made a misdemeanor arrest.  Ms. Conder also received another memorandum in November advising her that she had issued a citation charging a motorist under an incorrect code and directing her to how to resolve the matter.

In January 2007, Chief Lloyd and Corporal Buchanan spoke often about problems with Ms. Conder's work performance.  During that month, Ms. Conder received two letters of counseling and one letter of reprimand from Corporal Buchanan all dated January 18, 2007.  In the first counseling letter, Ms. Conder was counseled that it was inappropriate for her to have left evidence, obtained from a suspect booked on charges of aggravated robbery, sitting on her desk

when she left work, rather than securing the evidence in an evidence locker or properly releasing the evidence.  Ms. Conder testified that she did not believe the item was evidence or that it needed to be secured.  In the second counseling letter, Corporal Buchanan also informed her that the report she had submitted regarding the aggravated robbery had misspelled words and was missing information important for successful screening and prosecution of the case.  Corporal Buchanan stated that "[i]t was obvious that you did not proofread the report or use [s]pell [c]heck" and that "[t]he report appeared to have been hastily written and was an embarrassment to the department."[21]

In the letter of reprimand, Corporal Buchanan reprimanded Ms. Conder for failing to file her report in a timely manner, as he had instructed.  Specifically, Ms. Conder got permission to file the report from home provided it was completed the following morning.  Corporal Buchanan stated:

> When I returned to work at 1400 hours on Sunday, you still had not submitted the report.  At 2130 hours, I called you and left a message asking if you had forgotten about it.  Approximately 2200 hours, you called back, said you had not forgotten and that the report was almost finished.  Later in the conversation, you said it was finished and you could bring it into the station.  You were told to submit it by computer.  It was not submitted.  It was not actually submitted until 0300 hours on Monday morning, long after the time you had been told it was due.  Not only did you fail to submit the report Sunday morning as directed, you also failed to submit it at 2200 hours as directed.  You are hereby reprimanded for failing to obey the instructions of your supervisor.[22]

---

[21] *Id.*, exhibit 20.

[22] *Id.*, exhibit 21.

When asked about the letter of reprimand in her deposition, Ms. Conder testified that she could not recall specifically what had transpired during the underlying incident.

On January 25, 2007, Ms. Conder received another performance evaluation in which she received "unsatisfactory" ratings in the areas of dependability and follow through with job requirements.[23]  She also received "marginal" ratings in judgment, quality of work, and cooperation.[24]  In the evaluation, Corporal Buchanan notes that Ms. Conder's written work and evidence handling was poor and that it was difficult to get her to follow directions.  Corporal Buchanan also stated in the evaluation:

> She rarely takes responsibility for mistakes or failing to follow directives.  When corrected, she gives misleading statements in an attempt to justify her actions.  She cannot be depended upon to have reports completed on time or keep obligations.  She often leaves pertinent information out of her reports.  She often fails to proof read reports or use spell check.[25]

Ms. Conder was provided an employee development plan at approximately the same time she received her performance evaluation.  In the plan, Corporal Buchanan identified Ms. Conder's strengths and accomplishments, areas in which she could improve, and specific goals and areas for growth.  When asked about the plan in her deposition, Ms. Conder agreed that her paperwork should be completed and turned in each day before going home and that her report narratives should be improved to include all information obtained and to eliminate spelling, grammatical, and typing errors.

------

[23] *Id.*, exhibit 22.

[24] *Id.*

[25] *Id.*

On the same day that she received the employee development plan, Ms. Conder asked Corporal Buchanan if she could hold a lewdness report and an arrest report rather than finishing them before going home.  When Corporal Buchanan informed her that she could not, she responded with "the angry statement, 'Then I guess I'll just be here all night writing reports.'"[26] When asked about this incident at her deposition, Ms. Conder initially stated that she could not remember having the conversation with Corporal Buchanan nor her statement about being at work all night to finish the reports.  Then Ms. Conder stated:  "I remember saying -- telling him, 'Okay, well, then I'm going to be after my shift doing reports.'"[27]

Ms. Conder received two letters of reprimand, both dated March 15, 2007, from Corporal Buchanan.  In the first letter of reprimand, Corporal Buchanan stated that Ms. Conder had left some molding that had come off of her patrol car on her desk for two months after she had been instructed to have Bountiful Collision Repair reattach the molding.  Corporal Buchanan also stated in the letter:

> On March 9, 200[7], I left you written instruction telling you to get the molding replaced the next day.  You took the molding off your desk but did not get it replaced.  As of today, the molding still has not been replaced.  Your excuse for failing to follow direction was that the weather was too cold for the molding to properly adhere to the car.  Even though the weather has been warm for over a week, there has been a spare car[] available for your use, and you have . . . been off duty since last being directed to replace the molding, you still have not replaced it.  You are hereby reprimanded for failing to get the molding replaced as directed.[28]

---

[26] *Id.*, exhibit 25.

[27] *Id.*, exhibit 35 at 161:8-10.

[28] *Id.*, exhibit 27.

12

The following is an excerpt from Ms. Conder's deposition regarding this incident.

> Q.   Okay.  So let's go with first Deposition Exhibit 31, okay.  This is referring to
> some car molding that had sat on your desk for two months that had come off of
> your patrol car.  Do you remember Sergeant [Miles] Simonsen telling you to have
> it--to take it to Bountiful Collision Repair and have it reattached?
> A.   Yes.
> Q.   And had that occurred several months before you received this March –
> A.   I don't know.
> Q.   Okay.  Do you remember receiving a written instruction from Corporal
> Buchanan on March 9, 2007, telling you to get the molding replaced the next day?
> A.   I don't know.
> Q.   At the time that you received this letter of reprimand had you had the
> molding replaced?
> A.   I don't know.[29]

In the second letter of reprimand, Corporal Buchanan stated that Ms. Conder had filled

out forms for a training request in a manner that gave the false impression that the training had

been approved by Sergeant Simonsen, when it had not.  Ms. Conder testified in her deposition

that she had received approval from Sergeant Simonsen and Chief Lloyd to take the training as

long as Corporal Buchanan would approve Ms. Conder's request for time off.  Chief Lloyd

testified that both Corporal Buchanan and Sergeant Simonsen

> came to me, and they explained the fact that Mary Conder had told them – or led
> them to believe that one thing had happened, when, in fact, that's not the case.
> And what I'm referring to is she was playing one end against the other, is what
> they felt, and that she wasn't being honest in – in her reporting of the event.
> Basically, she was indicating that she had been approved for the days off and
> approved to one supervisor that she could, in fact, go to this training.  Then the
> other one was told that that was approved, when, in fact, it hadn't been.[30]

---

[29] *Id.*, exhibit 35 at 175:10-176:3.

[30] *Id.*, exhibit 37 at 111:10-21.

13

Ms. Conder received another letter of reprimand from Corporal Buchanan dated March 17, 2007.  In the letter, Corporal Buchanan states that for the time/pay period of February 17, 2007, through March 2, 2007, Ms. Conder submitted a time card for more hours worked than were recorded on the schedule.  Ms. Conder testified that she was only filling out the time card in the manner in which she had been taught.

Ms. Conder received a final letter of reprimand from Corporal Buchanan, dated March 19, 2007.  In the letter, Corporal Buchanan documents that, on March 17, 2007, Ms. Conder had held shift reports without authorization from her supervisor despite the fact she had been told two days earlier not to hold reports and she had received prior verbal reprimands for holding reports without authorization.  The following is an excerpt from Ms. Conder's deposition regarding this incident.

> Q.   Okay.  Had you held reports on Saturday, March 17th?
> A.   No.
> Q.   All of your reports were done and submitted before you left your shift that day?
> A.   Yes.
> Q.   Do you know why he would think that you had held shift reports without authorization?
> A.   I don't know.
> Q.   You didn't ask him?
> A.   No.  By this point I was told anything that I said or anything that I tried to explain or anything like that, that I was just making excuses.[31]

Ms. Conder testified that each time she was reprimanded or told she was doing something wrong, she said, "I'm feeling that this is a hostile work environment."[32]  By hostile work

---

[31] *Id.*, exhibit 35 at 182:21-183:8.

[32] *Id.* at 167:23-168:2.

14

environment, Ms. Conder meant that everything she did was wrong and it was like she couldn't

do anything right.  Ms. Conder testified that approximately a week prior to her discharge, she

informed Corporal Buchanan and a secretary that she was going to hire an attorney and file a

claim with Utah Antidiscrimination and Labor Division (the "UALD").

      Sometime in late March 2007, Chief Lloyd and Corporal Buchanan informed Ms. Conder

that the City was not going to continue to employ her, and she was given the option of resigning

rather than having her employment terminated by the City.  After consulting with an attorney,

Ms. Conder called the WBCPD and said that she was resigning.  Ms. Conder then consulted with

a different attorney, and based on that consultation, she decided that she should not resign.

However, there is no evidence that Ms. Conder informed the City that she was not resigning and

opted to be terminated instead.

      On June 3, 2007, Ms. Conder signed a Charge of Discrimination with the UALD and the

Equal Employment Opportunity Commission alleging gender discrimination and retaliation

between the dates of January 1, 2006, and March 15, 2007.  Ms. Conder was questioned about

the allegations in the charge of discrimination.  The following is an excerpt from her deposition:

> Q.   Going through it, it says, "I was disciplined for committing the same
> infractions that male coworkers committed while males were not."  What specific
> infractions do you think you were written up for that no males were written up
> for?
> A.   For damaged property, for the shotgun, for reports, for evidence.  Just about
> everything that I was written up for, at one point in time somebody else was
> counseled on that stuff.
> Q.   So you're saying male employees would get counseled on it but you would
> get a report written, is that what -- I'm not sure what you're saying.
> A.   I would get written up and they did not.

Q.   Okay.  Do you know if they had had prior incidences of problems with their handling of evidence?

A.   Yes.

Q.   And how do you know what they --

A.   Well, that was one of the reasons that the whole memo came out about evidence because Ryan was talked to several times.  Josh, who was a new officer, was talked to several times about leaving evidence on his desk and then a memo came out.

Q.   Okay.  And then the memo came out and then you left evidence on your desk after the memo came out?

A.   I did not consider it evidence.

Q.   Okay.  Who was treated differently as far as the writing of reports?

A.   Everybody got their reports kicked back.

Q.   Okay.

A.   I was told that Jeremy Adams had the worst reports in the whole department.

Q.   Who told you that?

A.   [Corporal] Buchanan.

Q.   Do you know if he was ever written up for it?

A.   No, he wasn't.

Q.   How do you know that?

A.   Because I asked Jeremy.  I even had a conversation with Ryan and he said, "Yeah, I get my reports kicked back all the time, but I'm getting better, I think."[33]

Chief Lloyd testified that when he began his post as chief of the WBCPD in May 2006, the City employed five police officers and two supervisors.  He further stated that when Ms. Conder's employment with the City terminated, only two of those five officers and only one of the supervisors were still employed by the City.  As of March 19, 2009, only one of those original five officers is still employed by the City.

## DISCUSSION

In her complaint, Ms. Conder alleges that the City violated Title VII by terminating her

---

[33] *Id.* at 197:23-199:16.

employment on the basis of gender.  *See* 42 U.S.C. § 2000e-2(a)(1).  Ms. Conder also asserts that

the City retaliated against her for complaining that she "was being treated and disciplined

unfairly" and for informing Corporal Buchanan that she "was filing a complaint with the

[UALD] and was hiring an attorney."[34]

The City filed a motion for summary judgment on Ms. Conder's claims for gender

discrimination and retaliation.  Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary

judgment is appropriate if the record shows that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  *True v. United States*,

190 F.3d 1165, 1171 (10th Cir. 1999) (quotations and citation omitted).  Under this standard,

"[a] fact is material if under the substantive law it could have an effect on the outcome of the

lawsuit."  *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000)

(quotations and citation omitted).  "An issue is 'genuine' if 'a rational jur[or] could find in favor

of the nonmoving party on the evidence presented.'"  *Id.* (alteration in original) (quoting *EEOC

v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)).  In reviewing a

motion for summary judgment, the court "view[s] the factual record and draw[s] any reasonable

inferences therefrom in the light most favorable to the nonmoving party."  *Id.*  The court will

address each of Ms. Conder's claims in turn.

## I.  Gender Discrimination

Title VII enjoins an employer from discharging an employee on the basis of that

employee's gender.  *See* 42 U.S.C. § 2000e-2(a)(1).  A plaintiff bringing a Title VII gender

---

[34] Docket no. 1, paragraphs 21 & 24.

discrimination claim may prove intentional discrimination by direct or circumstantial evidence. *See Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008). In cases "[w]here, as here, an employee's . . . discrimination claim relies exclusively on circumstantial, rather than direct, evidence, [the court] appl[ies] the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 [(1973)]." *Timmerman v. United States Bank N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

Under the *McDonnell Douglas* analysis, a plaintiff "'bears the initial burden of setting forth a prima facie case of discrimination.'" *Sanders*, 544 F.3d at 1105 (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998)). "After the plaintiff makes a prima facie case, the burden shifts to the employer to give a legitimate, nondiscriminatory reason for its employment decision." *Id.* "If the employer comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual–i.e., unworthy of belief." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). A successful showing of pretext "enables a plaintiff to survive summary judgment." *Timmerman*, 483 F.3d at 1113. But a plaintiff must prove both her prima facie case and pretext by a preponderance of the evidence. *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005) (en banc) (per curiam) (pretext); *Horizon*, 220 F.3d at 1191 (prima facie case).

At the summary judgment stage, while evidence need not be presented in a form that would be admissible at trial, "the content or substance of the evidence must be admissible." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)

18

(quotations and citation omitted).  Ms. Conder "must still identify sufficient evidence requiring submission to the jury."  *Turner v. Public Servs. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009) (quotations and citation omitted).  "She cannot avoid summary judgment merely by presenting a scintilla of evidence to support her claim; she must proffer facts such that a reasonable jury could find in her favor."  *Id.*

## A.  Prima Facie Case

To demonstrate a prima facie case of gender discrimination, Ms. Conder must demonstrate that (1) she belongs to a protected class, (2) her job performance was satisfactory, (3) an adverse employment action was taken against her, and (4) the action was taken under circumstances giving rise to an inference of discrimination.  *See Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173-74 (10th Cir. 2005).  The parties agree that Ms. Conder has satisfied the first and third prongs of the prima facie test.  The City argues, however, that Ms. Conder has not presented admissible evidence to establish the second and fourth prongs of a prima facie case of gender discrimination.  Specifically, the City asserts that the deficiencies in Ms. Conder's job performance were well documented and that while Ms. Conder disputes some of the facts underlying the discipline she received, Ms. Conder also admits to some of the work-performance issues.  The City also contends that Ms. Conder has not established that the circumstances of her discipline and/or dismissal give rise to an inference of discrimination.

To demonstrate that she has satisfied the second prong of the prima facie test, Ms. Conder asserts that she testified that her work performance was satisfactory and that she received an average score on all of her performance evaluations.  Ms. Conder contends that her testimony

that her job performance was satisfactory is sufficient to satisfy this element of a prima facie case regardless of whether the City disputes this assertion. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1166 n.3 (10th Cir. 1998) ("[Plaintiff] insists that his work was satisfactory, . . . which is sufficient to satisfy this element of the prima facie case."). Ms. Conder also argues that she has demonstrated the fourth prong of the prima facie test by identifying two male employees who were not subjected to the same discipline she experienced. *See Hysten v. Burlington N. and Santa Fe Ry. Co.*, 296 F.3d 1177, 1182 (10th Cir. 2002) ("A plaintiff wishing to prove discriminatory animus with evidence that his employer treated him differently from other employees bears the burden of showing that the comparison is legally relevant–i.e., that the employees were similarly situated."). Ms. Conder further contends that two other factors create the inference that she was being treated differently: (1) her probationary period was extended a year because a male officer failed to conduct a sufficient background check when she was hired and (2) the scrutiny to which she was subjected was focused on petty issues. *See Sorbo*, 432 F.3d at 1173 (holding that the fourth prong may be satisfied by proof other than "the employer treated similarly situated employees more favorably" because "such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case").

While the court is not convinced that Ms. Conder has established a prima facie case of gender discrimination by a preponderance of admissible evidence, *see Horizon*, 220 F.3d at 1191 ("A plaintiff relying on the *McDonnell Douglas* methodology bears the initial burden of establishing a prima facie case by a preponderance of the evidence."), the court will assume that

20

she has for purposes of this motion.  *See Argo*, 452 F.3d at 1201 ("For most plaintiffs, establishing a prima facie case is perfunctory, and liability turns on whether the defendant's stated explanation for the adverse employment action is pretextual.").  As such, the court will now determine whether the City has provided facially nondiscriminatory reasons for its actions regarding Ms. Conder.

### B.  The City's Burden

The court concludes that the City has met its burden.  Specifically, the City conducted the IA Investigation in order to investigate claims of misconduct against Chief Wright, Sergeant Sheldon, and Ms. Conder.  The City extended Ms. Conder's probationary status because of inconsistencies with Ms. Conder's responses to the personal history statement and the information obtained from Ms. Conder and others during the IA Investigation.  Rather than terminating her employment at that time, which they could have based on her admitted misrepresentations and/or omissions in her personal history statement, the City extended her probationary status in order to provide her an opportunity to rise to the new standards of a more disciplined police department and allow her sufficient time to meet the City's expectations.  As both Chief Lloyd and Mayor Behunin testified, the City wanted to establish a more disciplined and professional police force.  After the IA Investigation was completed, Mayor Behunin advised Ms. Conder that the City wanted a more effective police department and expected her to be part of that process.  Rather than meeting those expectations, however, Ms. Conder's work-performance issues continued.  Ms. Conder's police reports were repeatedly returned for deficiencies, and she continually failed to follow the directives of her supervisors.  The City

disciplined and ultimately terminated Ms. Conder's employment because she failed to meet those higher standards of professionalism required by the City.

Furthermore, the City's assertion that it wanted to establish a more disciplined and professional police force is substantiated by Chief Lloyd's testimony that when Ms. Conder's employment with the City terminated, only two of the original five officers and only one of the supervisors were still employed by the City. Because the City has met its burden to provide legitimate nondiscriminatory reasons for its actions in relation to Ms. Conder, the burden shifts back to Ms. Conder to establish a genuine issue of material fact as to whether the City's proffered reasons are pretextual.

### C. Pretext

"A plaintiff demonstrates pretext by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Jaramillo*, 427 F.3d at 1308 (quoting *Morgan*, 108 F.3d at 1323). However, "[m]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Morgan*, 108 F.3d at 1323 (second alteration in original) (quotations and citation omitted). Pretext is generally demonstrated in one of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an

22

> unwritten policy or contrary to company practice when making the adverse
> employment decision affecting the plaintiff.  A plaintiff who wishes to show that
> the company acted contrary to an unwritten policy or to company practice often
> does so by providing evidence that he was treated differently from other
> similarly-situated employees who violated work rules of comparable seriousness.

*Green v. New Mexico*, 420 F.3d 1189, 1193 (10th Cir. 2005) (quotations and citation omitted).

### 1.  Extension of Probation

Ms. Conder asserts that the City's actions in extending her probationary period were merely a pretext for gender discrimination because (1) the IA Investigation was instigated based on allegations by Cory Green whose father was the other applicant for Ms. Conder's position and (2) the IA Report did not make a specific finding that Ms. Conder engaged in misconduct.  The court concludes that no rational juror would find either reason to be evidence of pretext for gender discrimination.  The fact that the IA Investigation was instigated based on the allegations of Cory Green does not establish that the City discriminated against Ms. Conder based on her gender.  In fact, the IA Investigation was instigated on the basis of allegations of misconduct against two male employees, Chief Wright and Sergeant Sheldon, as well those against as Ms. Conder.  Sergeant Sheldon was eventually demoted to the position of Corporal, and Chief Wright was fired.  Furthermore, while the IA Investigation did not come to a specific conclusion regarding the allegations against Ms. Conder, the IA investigator did note that some of Ms. Conder's specific answers in her personal history statement conflicted with Mr. Evans's interview.  The IA investigator also stated that Ms. Conder admitted that she failed to disclose the problems she had with her previous employers in her personal history statement even though the personal history statement provides that  "[a]ny attempt to misrepresent, omit or falsify

23

information will result in the immediate denial of further consideration for employment or will be cause for immediate dismissal if an appointment has been made."[35]  Thus, rather than firing Ms. Conder based on her admissions that she misrepresented information in her personal history statement, the City allowed her the opportunity to rise to the new standards of a more disciplined police department and allow her sufficient time to meet the City's expectations.  The court concludes that Ms. Conder has not demonstrated that the City's proffered reasons for extending her probation were merely a pretext for gender discrimination.  As such, Ms. Conder has failed to demonstrate a genuine issue of material fact as to pretext on this basis.

## 2. Discipline and Discharge

Ms. Conder also asserts that the City's actions in disciplining and ultimately discharging her were merely pretext for gender discrimination.  Specifically, Ms. Conder contends that she identified two similarly situated male officers who had the same kind of work-performance issues she did but were not disciplined for them.  "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline."  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (quotations and citation omitted).  Ms. Conder compares herself to an officer named Josh, whom she alleges was counseled by administration about leaving evidence on his desk; and Officer Adams, whom she alleges had poor reports but was not written up for those reports.  However, Ms. Conder has not produced any admissible evidence to support these allegations.  Rather, Ms. Conder relies solely on inadmissible speculation and

---

[35] Docket no. 27, exhibit 2.

hearsay to support her allegations.  Ms. Conder was not a supervisor and there is no evidence

that she had access to disciplinary records for other officers.  Ms. Conder did not question Chief

Lloyd during his deposition regarding the discipline or counseling received by other officers.

Ms. Conder did not depose Josh or Officer Adams.  Furthermore, Ms. Conder did not establish

that the officers she identifies were similarly situated to her.  She has not demonstrated that the

other officers had the same supervisor or were subject to the same standards as she.  *See id.*  Ms.

Conder's speculation, based on inadmissible hearsay, as to whether other officers were

counseled or disciplined is not admissible evidence.

Ms. Conder also asserts that she has demonstrated pretext because the two letters of

counseling and the one letter of reprimand she received in January 2007 were based on a single

incident.  Ms. Conder, however, has failed to show how that is relevant.  She has not

demonstrated that by providing three letters regarding a single incident, the City "acted contrary

to a written company policy prescribing the action to be taken" by the City in this situation or

that the City "acted contrary to an unwritten policy or contrary to company practice."  *Green*,

420 F.3d at 1193 (quotations and citation omitted).  Accordingly, the fact that the two letters of

counseling and one letter of reprimand relate to a single incident is not enough to demonstrate

pretext.

Furthermore, Ms. Conder's testimony that she was a competent employee is, without

more, insufficient to demonstrate pretext.  "It is the manager's perception of the employee's

performance that is relevant, not plaintiff's subjective evaluation of his own relative

performance."  *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996).  "It is not enough

that a factfinder could disagree with the employer's assessments.  The relevant inquiry is not

whether [the City's] proffered reasons were wise, fair or correct, but whether [it] honestly

believed those reasons and acted in good faith upon those beliefs."  *Exum v. U.S. Olympic

Comm.*, 389 F.3d 1130, 1138 (10th Cir. 2004) (quotations and citations omitted); *see also*

*Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997) ("[A

plaintiff] cannot avoid summary judgment with an unadorned claim that a jury might not believe

[defendant's] explanation for his termination; he must point to evidence suggesting that

[defendant] itself did not honestly believe that explanation.").

Based on the foregoing, the court concludes that Ms. Conder has failed to produce

admissible evidence of "'such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions'" in the City's legitimate reasons for disciplining and terminating her.  *Jaramillo*,

427 F.3d at 1308 (quoting *Morgan*, 108 F.3d at 1323).  Because no reasonable jury could find in

favor of Ms. Conder, her gender discrimination claim fails as a matter of law.

## II.  Retaliation

Ms. Conder alleges that the City discharged her in retaliation for complaining that she

was being treated and disciplined unfairly.  Title VII makes it unlawful for an employer to

discriminate against an employee for "oppos[ing] any practice made an unlawful employment

practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  To successfully invoke this provision, an

employee "must establish that retaliation played a part in the employment decision."  *Fye v.

Okla. Corp. Com'n*, 516 F.3d 1217, 1224 (10th Cir. 2008).  This may be accomplished by

"directly show[ing] that retaliatory animus played a motivating part in the employment decision"

or, if there is no direct evidence of the employer's motive, by relying "on the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation." *Id.* at 1225 (quotations and citation omitted). Because there is no direct evidence of retaliation in this case, the court applies the burden-shifting framework of *McDonnell Douglas*.

"To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo*, 452 F.3d at 1202 (10th Cir. 2006) (footnote omitted). If Ms. Conder can establish a prima facie case of retaliation, the burden then shifts to the City to provide a legitimate nondiscriminatory reason for her discharge. *See id.* If the City meets its burden, Ms. Conder must then demonstrate that the City's proffered explanation is a pretext for retaliation. *See id.*

The City asserts that Ms. Conder has not established the first and third elements of a prima facie claim of retaliation. As to the first element, the City contends that Ms. Conder has not presented evidence that she engaged in protected opposition to discrimination. In response, Ms. Conder claims that she did inform her chain of command on multiple occasions that she believed that their actions constituted a "hostile work environment."[36] "Protected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). "Although no magic words are required, to

---

[36] *Id.*, exhibit 35 at 167:15-17.

27

qualify as protected opposition, the employee must convey to the employer his or her concern that the employer has engaged in [an unlawful] practice." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  The court concludes that Ms. Conder's testimony that she informed Corporal Buchanan that she was going to file a complaint with the UALD because she felt she was the victim of a hostile work environment is sufficient to establish the first element of a prima facie case of retaliation.

As to the third element, "a causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (quotations and citations omitted).  While the exact date is unclear, Ms. Conder's informal complaint to Corporal Buchanan happened about a week prior to her discharge.  Given the close proximity to her discharge, the court concludes that Ms. Conder has established a causal connection between the protected activity and the materially adverse action. Accordingly, Ms. Conder has demonstrated the existence of a prima facie claim of retaliation.

However, as addressed above, because the City has provided facially nondiscriminatory reasons for Ms. Conder's discharge, the burden shifts back to Ms. Conder to demonstrate that the City's reasons were merely pretext for retaliation.  "Although temporal proximity is one relevant factor to be considered by the courts in determining whether the employer's explanation is a pretext for retaliation, [the Tenth Circuit] has refused to allow even very close temporal proximity to operate as a proxy for th[e] evidentiary requirement that the plaintiff demonstrate pretext." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006)

28

(quotations and citations omitted) (second alteration in original).  In order "[t]o raise a fact issue

of pretext, [Ms. Conder] must therefore present evidence of temporal proximity plus

circumstantial evidence of retaliatory motive."  *Id.*  The court concludes that Ms. Conder has

failed to do so.  While Ms. Conder has demonstrated the temporal proximity of her protected

action and the adverse action, she has not coupled that with circumstantial evidence of a

retaliatory motive.  In fact, Ms. Conder has presented no evidence of a retaliatory motive.

Therefore, Ms. Conder has failed to demonstrate that the City's actions against her were

pretextual.

In sum, Ms. Conder has not demonstrated any genuine issue of material fact exists as to

pretext.  Because she failed to satisfy her pretext burden, summary judgment on her retaliation

claim is appropriate.

## CONCLUSION

The City's motion for summary judgment is **GRANTED**.  Accordingly, the court

dismisses Ms. Conder's claims with prejudice and orders each party to bear their own costs.

**IT IS SO ORDERED.**

DATED this 23rd day of July, 2009.

BY THE COURT:

_____

PAUL M. WARNER
United States Magistrate Judge